UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

       Plaintiff and Counterclaim Defendant

       - against -

BGC PARTNERS, INC.; BGC BROKERS US,
L.P.; BGC FINANCIAL, L.P.; and BGC USA L.P.

       Defendants and Counterclaim Plaintiffs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: April 25, 2013 |

10 Civ. 128 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

     Plaintiff International Business Machines Corporation ("IBM") brings this action against BGC Partners, Inc., BGC Brokers US, L.P., BGC Financial, L.P., and BGC USA, L.P. (collectively, "BGC") asserting claims for copyright infringement, breach of contract, and replevin. BGC counterclaims for breach of contract and for declaratory judgment. IBM's claims and BGC's counterclaims relate to BGC's right to possess and use IBM's Informix database management and transaction processing software, which BGC used to operate its inter-dealer brokerage business. IBM has moved for summary judgment on both its claims and BGC's counterclaims. For the reasons below, the Court DENIES IBM's motion.

BACKGROUND[1]

     In 2001, IBM acquired software assets and related contracts from Informix Software, Inc. ("Informix") (Ex. A at 103-04), prior to which Informix provided maintenance services to

---

[1] All references to lettered exhibits, such as "Ex. A," refer to exhibits to IBM's Memorandum of Law in Support of the Motion for Summary Judgment ("Pl. Br.") or its Reply in Support of the Motion for Summary Judgment. ("Pl. Reply.") All references to numbered exhibits, such as "Ex. 1," refer to exhibits to BGC's Memorandum of Law in Opposition to the Motion for Summary Judgment. ("Defs. Opp'n.") Many exhibits were attached to both parties' memoranda, and, accordingly, their alphabetical and numerical exhibit numbers may be used interchangeably.

customers of its software – including BGC's predecessors in interest, Euro Brokers Investment

Corp., Euro Brokers, Inc., and Euro Brokers Services, Ltd. (collectively, "Euro Brokers"[2]) –

under standardized programs entitled "OpenLine" and "Assurance."  (Ex. B at 98.)  Following its

acquisition of Informix in 2001, IBM announced that it would "maintain existing relationships

with Informix customers and business partners, including support for and updating of current

Informix products" (Ex. 13; see also Ex. K), which it did.  (Defs. 56.1 Stmt. ¶ 8.)

The parties dispute whether Informix's licensing of its software to Euro Brokers was

governed pursuant to a customized contract or a standardized license.  (Compare Defs. 56.1

Stmt. ¶¶ 5-6, with Pl. 56.1 Stmt. ¶¶ 5-6.)  In particular, BGC claims that the relationship between

Euro Brokers and Informix was governed by a bespoke contract signed in or around August,

1992 (the "Euro Brokers Agreement").  (Ex. 3 at 87-88; Ex. 8 at 91-93; Ex. 10 at 53.)  BGC's

original copy of the Euro Brokers Agreement was destroyed in the September 11, 2001 terrorist

attack on the World Trade Center, in which Euro Brokers had an office, and IBM has been

unable to locate a copy in its own records.  (Ex. 27; Ex, 29; Ex. 30.)  BGC asserts that the 1992

Euro Brokers Agreement could only be modified by a written document signed by authorized

representatives of both Euro Brokers and Informix that expressly referenced the Euro Brokers

Agreement (Defs. 56.1 Stmt. ¶ 63 (citing Exs. 86-97, each at § 14.5)), and that if it were

terminated as a result of Euro Brokers' breach, Euro Brokers would continue to have the right to

use all products for which the licensing fees had previously been paid.  (Id. (citing Exs. 86-97,

each at § 11.3(b)).)

IBM, however, asserts that the Euro Brokers Agreement never existed.  Rather, IBM

claims that the relationship between Informix and Euro Brokers had been governed by a

---

[2] Euro Brokers was acquired by BGC in 2005.  (Ex. L at 10-11.)  It will generally be referred to as Euro Brokers for events occurring prior to 2005, and as BGC for events occurring after 2005.

standardized "serial number license."  (Ex. B. at 66-69; 76-77; 95-97; 162.)  After IBM's 2001 acquisition of Informix's software and related contracts, IBM argues that the serial number license governed the relationship between IBM and Euro Broker.  (Id. at 192.)

Beginning in 2003, IBM moved 88% of customers using Informix's software  to its Passport Advantage program.  (Ex. B at 203-06.)  Along with other customers of the Informix software, Euro Brokers was mailed a copy of the IBM's International Passport Advantage Agreement ("IPAA"), a price quote, a Passport Advantage enrollment form, and a letter entitled "Transitioning your Informix Products to Passport Advantage." (Ex. B at 206, 212-13.)  On March 6, 2003, IBM sent an email to Euro Brokers stating that it was "being migrated over to IBM's Passport Advantage Program" with the quotation and enrollment form as attachments.[3] (Ex. 39.)  The enrollment form stated that the Passport Advantage program would be governed by the terms of the IPAA and International Program License Agreement ("IPLA"), which it incorporated by reference.  (Ex. O.)  On March 10, 2003, Euro Brokers faxed a purchase order for one "IBM Informix Software Maintenance Renewal" to IBM.  (Ex. S.)  While the purchase order stated that "Transitioning Informix Products to IBM Passport Advantage apply [sic] to this quote" (id.), this language was included only after Euro Brokers informed IBM that it did not wish to transition to Passport Advantage, to which IBM responded that BGC had no choice in the matter and specifically instructed the BGC employee submitting the purchase order to include this language.  (Ex. 7 at 57-58, 69.)  The parties dispute whether Euro Brokers concurrently filled out the Passport Advantage enrollment form (compare Pl. 56.1 Stmt. ¶ 24,

---

[3] BGC asserts that it did not receive either the "Transitioning Informix Products to IBM Passport Advantage" letter or a copy of the IPAA until 2008, at which point they were provided by IBM in connection with the instant litigation.  (Defs. 56.1 Stmt. ¶ 18 (citing Ex. 10 at 172 (as amended by errata sheet); Ex. 27).)  The record does not indicate that these documents were received by Euro Broker when IBM initially mailed them in 2003.

with Defs. 56.1 Stmt. ¶ 24), a prerequisite to transitioning to the Passport Advantage program. (Ex. B. at 215.)

On March 12, 2003, IBM sent Euro Brokers a Welcome Letter and Proof of Entitlement. (Ex. U.)  The Proof of Entitlement stated that all of the products listed therein were "provided to [Euro Brokers] subject to the terms of the IBM International Passport Advantage Agreement," and provided an internet address for the "IBM Program License Agreement and product License Information documents."  (Id.)  IBM's letter also noted, however, that "if special terms apply to [a customer's] specific Passport Advantage agreement, some parts of the standard terms may not apply or may have been modified."  (Id.)  IBM sent Euro Brokers and BGC similar Proofs of Entitlement in 2004, 2005, 2006, 2007 and 2008, which set forth the specific number of users and concurrent sessions of the Informix software that Euro Brokers and BGC were entitled to use.  (See Exs. 52-56; Ex. B at 220-21.)  IBM also sent renewal quotes in each of these years, all of which were approved and paid.  (Pl. 56.1 Stmt. ¶ 31; see Exs. 45-49.)  In 2004, Euro Brokers purchased an additional license for Informix Software, and received an additional, similarly worded Proof of Entitlement.  (Ex. AA.)  From 2005 through early 2009, BGC downloaded and installed Informix software, for which it received technical support from IBM.  (Ex. BB at 66-70, 111-12, 122-50; Ex. DD at 46-47, 56-67; Ex. FF at 163-64; Ex. NN.)

In September, 2007, IBM employees began exchanging internal correspondence regarding BGC's use of Informix software based on suspicions that "something just [did not] add up" (Ex. 61) and questioning whether something "look[ed] fishy" (Ex. 62) because the number of licensed sessions that Informix was entitled to run "look[ed] low relative to the number of tools."  (Ex. 64.)  On February 1, 2008, IBM sent an email to BGC requesting a discussion of BGC's "software installation . . . to better understand [BGC's] current use of Informix."  (Ex. 65;

4

see also Ex. 66.)  IBM subsequently requested and received data from BGC regarding its use of Informix software, which it sought to analyze internally "to determine what they are running/deploying versus what they have entitlements to."  (Ex. 69; see also Ex. 68.)  Internally, IBM concluded on March 7, 2008, that BGC was entitled to run 14 concurrent session of Informix software, but that it needed to license an additional 2,056 sessions, which would cost approximately $995,000.  (Ex. 70.)

On April 14, 2008, IBM informed BGC that it had hired KPMG to conduct "an assessment of [BGC's] deployment and use of IBM software in accordance with applicable license agreements."  (Ex. HH.)  KPMG provided an audit report to IBM and BGC on August 22, 2008, which purports to show that BGC employed Informix software in greater numbers than it was entitled to use.[4]  (Ex. II.)  Following the audit report, IBM and BGC met regarding the audit's results, but were unable to amicably resolve their dispute.  On September 8, 2008, IBM sent BGC an invoice for $1,730,665.24 for additional software licenses, along with fees for technical support.  (Ex. JJ.)  BGC declined to purchase any additional licenses (Defs. 56.1 Stmt. ¶ 52), though it continued to pay for software maintenance and support.  (Ex. 80.)  BGC also sent emails to IBM on September 26, 2008, and October 8, 2008, requesting that IBM produce its copy of the Euro Brokers Agreement, which BGC referred to as "an indispensible starting point to understanding the situation."  (Exs. 76, 77.)  IBM failed to do so and, on December 29, 2008, it notified BGC that, unless BGC paid IBM $1,730,665.24 for its use of unlicensed Informix software by December 31, 2008, BGC's licenses would be terminated and it would be required

---

[4] BGC disputes the veracity of KPMG's audit report, as well as its admissibility.  (See Defs. Opp'n at 16-18.)  Since the Court resolves the instant motions without reliance on the audit report, it is not necessary to address the report's admissibility.

to destroy all copies of the software. (Ex. KK.) Nevertheless, BGC continued to download and use Informix software after December 31, 2008, without making the requested payment.

Specifically, BGC acknowledges that it continued to use Informix Dynamic Server 9.21, 9.30, and 9.40; Informix 4GL Compiler Development 7.32; Informix 4GL Interactive Debugger 7.32; Informix 4GL RDS Development 7.32; Informix SQL Development 7.32; and Informix Client SDK 2.90. (Exs. DD at 68-72, 74-75; LL; NN.) BGC also acknowledges downloading, but not installing or using, Informix 4GL Compiler 7.50, Informix 4GL Interactive Debugger 7.50, Informix 4GL RDS Development 7.50, and Informix SQL Development 7.50.[5] (Id.) At minimum, IBM holds copyright registrations on Informix Client SDK 290 and all versions of the Informix Dynamic Server. (Ex. VV; see aso § II, infra.)

BGC also continued to pay IBM for the use of the Informix software in 2009. On June 25, 2009, BGC wrote a check to IBM in the amount of $14,756.61. (Ex. 80.) This amount was consistent with the BGC's annual maintenance and support payments to IBM over the course of BGC's use of Informix software. (Ex. 111 at ¶ 16.) IBM has repeatedly declined to provide support and maintenance services to BGC on several subsequent occasions and attempted to refund the payment, which BGC has refused. (Id. at ¶¶ 17-25.)

### DISCUSSION

Summary judgment may be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to

---

[5] Initially, IBM also alleged that BGC downloaded, installed, or used Informix Dynamic Server 10.0 after December 31, 2008, but it has since withdrawn that charge. (See Pl. Reply at 1 n.3.)

relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the

non-moving party, which "must set forth specific facts showing that there is a genuine issue for

trial," wherein "a reasonable jury could return a verdict for the non-moving party."  Anderson,

477 U.S. at 248.  "In reviewing a summary judgment motion, [the Court] must resolve all

ambiguities and draw all reasonable inferences in the non-movant's favor."  Vt. Teddy Bear Co.,

Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

## I.      IBM Count 1 – Breach of Contract

Even a cursory analysis of the parties' dispute demonstrates that there are numerous

questions of fact which preclude the granting of summary judgment.  To recover on a breach of

contract claim under New York law, the plaintiff must establish "(1) the existence of an

agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by

the defendant, and (4) damages."  Eternity Global Master Fund v. Morgan Guar. Trust Co. of

N.Y., 375 F.3d 168, 177 (2d Cir. 2004).  As we already know, and as will e discussed further,

there are genuine issues of material fact regarding the first element of IBM's claim: BGC

disputes that it is subject to the IPAA and IPLA, the agreements that it is alleged to have

violated.  Accordingly, IBM's motion for summary judgment on its breach of contract claim

must be denied because "the evidence supporting [BGC's] case is [not] so scant that a rational

jury could not find in its favor."  Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 86 (2d Cir.

1996).

### A.      There are Factual Questions Concerning the Euro Broker Agreement

The primary disputes between the parties is whether the relationship between Informix,

IBM's predecessor in interest, and Euro Brokers, BGC's predecessor in interest, was governed

pursuant to the Euro Brokers Agreement prior to 2003 and, if so, what the terms of that

agreement were.  IBM asserts that Euro Brokers was subject to Informix's standardized license terms (Ex. B at 76-77, 96-97) rather than an individualized contract (id. at 66-68), based on the testimony of Stacy Ness ("Ness"), an IBM employee who was hired by Informix in 2000.  (Id. at 69.)  This portion of Ness's testimony was based on her understanding of Informix's billing records for Euro Brokers (Ex. C; see also Exs. D, E), which contained "no indication . . . that they ever had a signed agreement" because they contained records of the serial numbers issued to the Informix software used by Euro Brokers.  (Ex. B at 96-97.)  Ness also testified that Euro Brokers was not included on a list of Informix's American customers that had held individualized contracts.  (Id. at 261.)

There are several significant factual concerns with Ness's conclusion that the Euro Broker Agreement did not exist.  First, Ness disclaimed any personal knowledge of how Informix licensed software in 1992, when its relationship with Euro Brokers began (id. at 69-70), or of how Informix billed its customers prior to her hiring (id. at 97-98), and she conceded that at least some Informix customers with bespoke contracts also received serial numbers.  (Id. at 113-14.)  Accordingly, her interpretation of the billing records is far from dispositive.  Second, in a May 2, 2008, email to which the billing records were originally attached, another IBM employee asked Ness about "the possibility of obtaining some old Informix contracts & agreements" and explained that IBM was "working on a possible compliance opportunity with Euro Brokers Inc[.] and *need*[*ed*] *additional information*."  (Ex. C (emphasis added).)  At the very least, this correspondence supports an inference that IBM recognized that its billing records were not sufficient to determine that Euro Brokers was subject to standardized terms or that a bespoke contract did not exist.  Finally, Ness relied on a list of Informix's American customers, without reviewing a similar list of English customers.  (Ex. B at 262.)  This severely undermines Ness's

8

conclusions because BGC has consistently asserted that the Euro Brokers Agreement may have been entered into by Euro Brokers' London-based affiliate.  (See, e.g., Exs. 3 at 87-89, 91-92; 8 at 94.)

In asserting that the Euro Brokers Agreement existed, BGC relies on the testimony of Walter Danielsson ("Danielsson"), who was employed by Euro Brokers and BGC from 1986 until 2008 (Ex. 3 at 27, 42), and Keith Reihl ("Reihl"), a current BGC employee who was hired by Euro Brokers in 1983.  (Ex. 8 at 9-10.)  Danielsson testified that Euro Brokers signed an agreement with Informix in 1992 or 1993, and, though he could not recall if he had read it, he identified two other Euro Broker employees with whom he discussed the contract, including Reihl.  (Ex. 3 at 86-93.)  Danielsson suggested that Euro Brokers would not have purchased the software without such an agreement because it was expected to affect the company's electronic infrastructure for at least a decade.  (Id. at 92-93.)  Accordingly, the software suite "was a major purchase" (id. at 89) and "wouldn't have been something you just picked up off a shelf."  (Id. at 90.)  Similarly, Reihl could not recall reading the agreement but remembered discussing the Informix software with Danielsson in 1992 or 1993.  (Ex. 8 at 91-92.)  Reihl further testified that "it is pretty clear in [his] mind that [Euro Brokers] entered into a specific agreement," that there was "no question in [his] mind one exists – or . . . existed," and that "[t]here's no doubt in [his] mind that [Danielsson] walked [him] through the details of the original licensing agreement."  (Id. at 92.)  BGC also points to correspondence it engaged in with IBM regarding the instant dispute, throughout which IBM stated that it could not locate a copy of the Euro Brokers Agreement, without denying the agreement's existence and appearing to proceed on the assumption that it had existed.  (See, e.g., Exs. 27, 29, 30, 31.)

**B.      There are Factual Questions Concerning the Terms of the Euro Broker Agreement**

BGC bears the burden of identifying "sufficient admissible evidence . . . so as to demonstrate that there exist[s] a genuine issue of material fact regarding the [Euro Broker A]greement." Trebor Sportswear Co., Inc. v. Ltd. Stores, Inc., 865 F.2d 506, 510 (2d Cir. 1989). While, in general, "[a]n original writing . . . is required in order to prove its content," Fed. R. Evid. 1002, that is not the case where, as here, "all the originals are lost or destroyed, and not by the proponent acting in bad faith." Fed. R. Evid. 1004(a). In such situations, "other evidence of the content of a writing . . . is admissible." Id. The secondary evidence BGC offers consists of a series of agreements entered into by Informix in 1992 and 1993 (see Exs. 86-97), a 1998 Informix agreement (Ex. 31) that counsel for IBM has referred to as "the basic form of license in effect during 1996" and that "was used from at least 1995 through 1998" (Ex. 32), and a 1995 license that counsel for IBM described as "strikingly similar to the [1998] sample license."[6] (Id.) These agreements are similar to one another and, though not identical in their entirety, contain many provisions that are identical. Most importantly, eleven of the fourteen contracts contain the following provision:

> This agreement may only be modified by a writing signed by an officer of Informix and a duly authorized representative of Licensee, expressly referring to this Agreement. Any purchase order issued by Licensee is for administrative convenience only.

---

[6] IBM asserts that Exhibits 31 and 32 are inadmissible settlement correspondence, but does not provide any analysis or support for this argument. (See Pl. Reply at 5 n.21.) The agreements themselves are not rendered inadmissible by Fed. R. Evid. 408 because, even assuming *arguendo* that IBM's descriptions of the agreements are inadmissible, Rule 408 "does not require the exclusion of any evidence that is otherwise discoverable merely because the evidence is revealed during negotiations." 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 408.07 (2d ed. 2008); see also Hallmark v. Cohen & Slamowitz, LLP, 283 F.R.D. 136, 139-140 (W.D.N.Y. 2012). Moreover, Rule 408 allows the admission of statements made during compromise negotiations, so long they are not offered "either to prove or disprove the validity or amount of a disputed claim" but rather "for another purpose." Fed. R. Evid 408. The statements by counsel for IBM are offered to aide in evaluating the weight to be given to the agreements in determining the terms of the Euro Brokers Agreement. Accordingly, they do not fall under the ambit of Rule 408. Indeed, the Court notes that IBM similarly relies on Ex. 32 in support of its own motion for sanctions. (Pl.'s Br. in Support of Mot. for Sanctions Ex. I.)

(Exs. 86-91, 93-97, all at § 14.5.)  Of the three that do not, one includes the first sentence of that provision, but makes no specific mention of purchase orders (Ex. 92 at § 8), and the 1995 and 1998 contracts contain the same provision as each other, which is substantially the same:

> This Agreement may only be modified by a writing signed by an officer of Informix and an authorized representative of Licensee.  This Agreement takes precedence over any purchase order issued by Licensee, which is accepted by Informix for administrative convenience only.

(Exs. 31-32 at § F(5).)  Though these are but a small sample of the 200 to 400 individual contracts Informix entered into prior to 2000 (see Ex. B at 128-29), IBM has not introduced any evidence to suggest that they are not a representative sample or that any of Informix's contracts did not contain a provision similar to those quoted above.

"[W]hen a question is raised as to whether a writing ever existed, or whether the evidence of the writing's contents reflects the actual contents, the issue is for the trier of fact to determine."  Servants of Paraclete, Inc. v. Great Am. Ins. Co., 857 F. Supp. 822, 829 (D.N.M. 1994) (citing Fed. R. Evid. 1008).  IBM argues that BGC cannot rely on Informix's contracts with parties other than Euro Brokers to establish the terms of the Euro Brokers Agreement, but Fed. R. Evid. 1004 allows for the existence and contents of a writing to be proven "'by any kind of secondary evidence.'"  Burroughs Wellcome Co. v. Commercial Union Ins. Co., 632 F. Supp. 1213, 1223 (S.D.N.Y. 1986) (quoting 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 1004.01 (1983)).  While IBM "is entitled to attack the sufficiency of the secondary evidence, . . . this attack goes not to admissibility but to the weight of the evidence and is a matter for the trier of fact to resolve."  Id.; see also 6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 1004.02 (2d ed. 2008).

The cases cited by IBM are not to the contrary.  First, in Burt Rigid Box Inc. v. Travelers Property Cas. Corp., 126 F. Supp. 2d 596, 622-24 (W.D.N.Y. 2001), evidence was found

inadmissible because it did not have sufficient probative value to be admissible under Fed. R. Evid. 807's residual hearsay exception.  This does not lend support to IBM's argument that the Informix contracts are not admissible because "there is no evidence that [they] bear similarity to the contract at issue" (Pl. Reply at 6), however, as the contracts' similarity relates to the weight assigned to them as evidence, not to their admissibility.

Second, IBM cites a grant of partial summary judgment to a plaintiff where the defendant, unable to produce the contract under which intellectual property was created, was unable to prove the existence or terms of the missing contract by "clear and convincing evidence." Archie Comic Publ'ns, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 329 (S.D.N.Y. 2003). This evidentiary standard is inapposite outside the realm of copyright law.  In DeCarlo, the plaintiff, who had hired the defendant, benefitted from a presumption under the Copyright Act of 1909 that "a work by an independent contractor such as [the defendant], in the absence of an agreement to the contrary, was a work for hire" and therefore belonged to the hiring party.  Id. at 328 (citing Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995)).  In that unique context, relying largely on "the strength of the presumption of a work for hire relationship absent proof of a contrary agreement" and a leading copyright treatise, Judge Kaplan found that the party challenging the presumption was "obliged to produce evidence sufficient to justify a finding of a contrary agreement by clear and convincing evidence."  Id. at 329.  A similar presumption is not available here.  Outside that specific context, cases assessing secondary evidence of the existence or terms of a missing contract have found "no reason to depart from the almost universally accepted general rule that the burden of proof . . . should be by a preponderance of the evidence." Glew v. Cigna Grp. Ins., 590 F. Supp. 2d 395, 411 (E.D.N.Y. 2008) (collecting cases and declining to follow DeCarlo).  Under the preponderance of the

evidence standard, a reasonable jury could find that the Informix contracts provided sufficient proof of the Euro Broker Agreement's modification provision.

BGC asserts that the Euro Broker Agreement is still in effect, and, as a result, IBM's attempt to migrate BGC to the IPAA and IPLA in 2003 were ineffective.  If BGC is correct, it could not be liable for breaching the IPAA and IPLA because it never entered into them.  IBM points to what it describes as a "mountain of evidence" that BGC migrated to the Passport Advantage program and assented to the terms of the IPAA and IPLA (Pl. Reply at 2), but none of the documents produced by IBM satisfy the purported requirements of the Euro Broker Agreement that any modification to the agreement be (1) in writing, (2) signed by authorized representatives of both parties, and (3) specifically reference the Euro Brokers Agreement.  See Conocophillips v. 261 E. Merrick Road Corp., 428 F. Supp. 2d 111, 121-22 (E.D.N.Y. 2006) (denying summary judgment where movants "failed to adduce evidence of a valid amendment or modification" to contract that "expressly provide[d] it can be amended, changed or modified only in a 'writing . . . signed by all of the parties'").  Because questions of material fact remain as to whether BGC was a party to the contracts that it allegedly breached, IBM's motion for summary judgment on Count I is denied.

## II.   IBM Count II – Copyright Infringement

It is well settled that computer programs are subject to copyright protection.  Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 702 (2d Cir. 1992).  To recover on a copyright infringement claim, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  Though "registration is not a condition of copyright protection," 17 U.S.C. § 408(a), "no civil action for infringement of the copyright in any United

States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."  17 U.S.C. § 411(a).

IBM alleges that BGC infringed its copyright in twelve different computer programs.  For at least three of those programs, however, § 411(a) precludes summary judgment in favor of IBM because it "impose[s] a mandatory precondition to suit" that IBM failed to satisfy.  <u>TI Training Corp. v. FAAC, Inc.</u>, No. 09 Civ. 973, 2010 WL 2490535, at *3 (D. Colo. June 15, 2010).  While IBM initiated the instant litigation in January, 2010, it did not register its copyright claims in Informix Dynamic Server 9.21, Informix Dynamic Server 9.40.xC8, Informix Dynamic Server 9.40.xC9, or "IBM Informix Tools"[7] until October, 2010.  (Ex. VV.)  Accordingly, summary judgment with regard to infringement of the copyrights for these programs must be denied.  <u>Mktg. Tech. Solutions, Inc. v. Medizine LLC</u>, No. 09 Civ. 8122, 2010 WL 2034404, at *1, *5-6 (S.D.N.Y. May 18, 2010).

IBM has also failed to point to sufficient evidence that it registered copyrights for Informix 4GL Compiler Development 7.32, Informix 4GL Compiler Development 7.50, Informix 4GL Interactive Debugger 7.32, Informix Interactive Debugger 7.5, Informix 4GL RDS Development 7.32, Informix 4GL RDS Development 7.5, Informix SQL Development 7.32, or Informix SWL Development 7.5.  None of these programs are specifically identified in the copyright registrations relied on by IBM.  Rather, some combination of these programs may be covered by the copyright registrations for "IBM Informix Tools, 5724-C66, Version 7.32xC3;" "IBM Informix 4GL, 5724-C66, Version 7.32.xC1;" "IBM Informix 4GL, 5724-C66, Version 7.32.xC2;" or "IBM Informix 4GL, 5724-C66, Version 7.50.xC1," but IBM has failed to

---

[7] Of the programs at issue, it is unclear what the copyright for "IBM Informix Tools, 5724-C66, Version 7.32.xC3" purports to cover, as the registration statement does not specify any of the programs at issue by name.  (<u>See</u> Ex. VV at IBM-BGC_000012934.)

introduce any admissible evidence identifying which program, if any, are covered by which of these registrations.[8]   (See Ex. VV at IBM_BGC_00003340-45, 00012934-35.)

IBM registered copyrights for Informix Dynamic Server versions 9.30 and 9.40.xC4, as well as Informix Client SDK 2.90 prior to January, 2010 (Ex. VV), each of which BGC acknowledges having used after December 31, 2008.  (Defs. 56.1 Stmt. ¶ 55.)  Even with regard to these copyrights, however, summary judgment must be denied because, as discussed supra, a reasonable jury could find that the Euro Brokers Agreement continued to govern the relationship between BGC and IBM at that date, and could further find that it authorized the continued use of these programs.  Specifically, BGC argues that "the governing Euro Brokers Agreement allows BGC to continue using the Informix software in use at the time of the termination of that Agreement in the event that such termination is the result of software over-deployment," as alleged here.  (Defs. Opp'n at 9.)  Of the fourteen Informix contracts submitted by BGC, ten contain a provision stating that:

> If this Agreement is terminated due to breach by Licensee . . . , all rights and licenses granted under this Agreement will terminate, except for Licensee's continued right to use Products for which the license fees have been paid to Informix . . . .

(Exs. 86-90, 93-97 at § 11.3(b)), while one contains a slight variation in which the provision applies to "breach by, or Financial Duress of, Licensee" (Ex. 91 at § 11.3(b)), and one grants "a nonexclusive, nontransferable right to acquire finished copies of Products listed in . . . this Agreement as generally available from Informix for Licensee's own end use," with no mention of the consequences of the agreement's termination.  (Ex. 92 at § 1.)  The 1995 and 1998

---

[8] IBM cites its own response to interrogatories propounded by BGC, but, "[t]o the extent [IBM] seeks to introduce statements from [its] own answers to interrogatories to prove the truth of the matters they assert, these statements are inadmissible hearsay."  Gilmore v. Macy's Retail Holdings, No. 06 Civ. 3020, 2009 WL 140518, at *10 (D.N.J. Jan. 20, 2009) (internal quotations omitted); see also Duff v. Lobdell-Emery Mfg. Co., 926 F. Supp. 799, 803 (N.D. Ind. 1996) ("If a party relies upon an opposing party's answers to interrogatories, the answers are admissible as statements of a party opponent, but a party's own answers to interrogatories are not so admissible.").

contracts, by contrast, provide for the termination of "all rights granted under this Agreement" or for the termination of "all rights granted under this Agreement,  . . . except for Licensee's continued right to use Products for which the license fees have been paid to Informix," depending upon the reason for the contract's termination.  (Ex. 31-32 at § E(2).)  Based on this evidence, a reasonable jury could conclude that, even if IBM had properly terminated its agreement with BGC, BGC was nevertheless entitled to continue using the Informix software at issue.  Accordingly, IBM is not entitled to summary judgment on its copyright infringement claims.

## III.    IBM Count III – Replevin

"To establish a claim for replevin, the plaintiff must prove two elements: (1) that plaintiff has a possessory right superior to that of the defendant; and (2) that plaintiff is entitled to the immediate possession of that property."  Jamison Bus. Sys., Inc. v. Unique Software Support Corp., No. 02 Civ. 4887, 2005 WL 1262095, at *14 (E.D.N.Y. May 26, 2005).  IBM has failed to establish its superior possessory right because, as discussed supra, a reasonable jury could find that BGC is still entitled to use the Informix software, pursuant to the Euro Brokers Agreement. Accordingly, IBM's motion for summary judgment is denied as to its claim for replevin.

## IV.    BGC Counterclaim I – Breach of Contract

IBM offers two grounds in support of its motion for summary judgment on BGC's breach of contract counterclaim.  First, IBM argues that BGC cannot establish the existence of the Euro Brokers Agreement, let alone its terms.  This argument is unavailing for the reasons stated supra regarding IBM's breach of contract and copyright infringement claims.

Second, IBM argues that BGC has failed to adduce any evidence that it suffered damages as a result of IBM's alleged breach of contract.  See Eternity Global Master Fund, 375 F.3d at

177.  In support of this argument, IBM cites the depositions of two BGC employees, each of whom testified that they are unaware of any damage that BGC has incurred as a result of IBM's failure to provide technical support subsequent to December 31, 2008.  (Exs. G at 219; EE at 185.)  IBM fails, however, to address spreadsheets offered by BGC that document the costs BGC incurred in migrating to another software platform from Informix (Exs. 98-99), which was necessitated, at least in part, by BGC's dispute with IBM.  (Ex. G at 253-54.)  Because a reasonable jury could conclude that these costs were caused by IBM's breach of the Euro Broker Agreement, IBM's motion for summary judgment is denied with respect to BGC's breach of contract counterclaim.

## V.   BGC Counterclaim II – Declaratory Judgment

IBM seeks summary judgment that BGC is not entitled to declaratory judgments that (1) the Euro Brokers Agreement was not superseded or amended; (2) BGC is not bound by the IPAA or IPLAA; and (3) BGC does not owe IBM $1.7 million in connection with its use of Informix software.  Since, as discussed supra, a reasonable jury could conclude that the Euro Brokers Agreement is still in effect and that BGC had not breached it or infringed on IBM's copyright, IBM's motion for summary judgment on BGC's claim for declaratory relief is denied.

### CONCLUSION

For the foregoing reasons, several genuine issues of material fact remain disputed. Accordingly, IBM's motion for summary judgment is denied in its entirety.

Dated: New York, New York
       April 25, 2013

                                            SO ORDERED

                                            _____
                                            PAUL A. CROTTY
                                            United States District Judge

17