UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

      Plaintiff and Counterclaim Defendant

         - against -

BGC PARTNERS, INC.; BGC BROKERS US,
L.P.; BGC FINANCIAL, L.P.; and BGC USA L.P.

      Defendants and Counterclaim Plaintiffs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  April  25, 2013
```

10 Civ. 128 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff International Business Machines Corporation ("IBM") brings this action against BGC Partners, Inc., BGC Brokers US, L.P., BGC Financial, L.P., and BGC USA, L.P. (collectively, "BGC") asserting claims for copyright infringement, breach of contract, and replevin. BGC counterclaims for breach of contract and for a declaratory judgment. The Court has already ruled on IBM's motion for summary judgment and sanctions. Familiarity with the underlying factual background as set out in the opinion and order on the summary judgment motion is assumed. See Int'l Bus. Maschs. Co. v. BGC Partners, Inc., No. 10 Civ. 128, Dkt. No. 95 (S.D.N.Y. Apr. 25, 2013) (the "SJ Decision."). Both sides have submitted numerous motions _in limine_.[1] The Court will first address BGC's four motions and then address IBM's motions and their subparts. The motions by BGC and IBM are granted and denied as indicated.

---

[1] Although they were filed separately, this decision addresses all of BGC's motions in limine, IBM's consolidated motions in limine, and IBM's consolidated motion to exclude the testimony of BGC's expert witness.

DISCUSSION

**I.      BGC's Motion to Limit Damages Evidence to Contractual Limitations Period**

IBM's expert, David A. Haas ("Haas"), calculated IBM's damages to be $106,796,621, before prejudgment interest, consisting of $2,117,483 in contractual damages accruing between January 7, 2004 and December 31, 2008; $3,753,137 in actual copyright infringement damages accruing between January 1, 2009 and December 31, 2010; and $100,926,000 in copyright profit disgorgement damages accruing between January 1, 2009 and December 31, 2010.  (Ex. E at ¶ 19.[2])  BGC now seeks to exclude all contractual damages that accrued prior to January 7, 2008, and after December 31, 2008, when IBM terminated its contractual relationship with BGC.

IBM filed its first Complaint (the "Complaint") on January 7, 2010, and its First Amended Complaint (the "FAC") on January 22, 2010, alleging, *inter alia*, that BGC "breached the [International Program License Agreement ("IPLA")] and other IBM licenses," which "governed BGC's right to use the Informix Software."  (FAC ¶¶ 38, 45.)  Pursuant to the IPLA, no legal action may be brought "more than two years after the cause of action arose . . . ."  (Ex. B at § 5.5; see also N.Y. C.P.L.R. § 201.)  If the IPLA governs the relationship between BGC and IBM,[3] BGC argues that this would place all pre-January 7, 2008, damages beyond the contractual statute of limitations.  In turn, according to Haas, this would limit IBM's maximum contractual damages to $1,239,116.  (See Ex. G at Ex. 3.0b.)

"In New York, a breach of contract cause of action accrues at the time of the breach,"

---

[2] References to lettered exhibits, such as "Ex. A," generally refer to exhibits to the relevant motion *in limine* submitted by IBM, while all references to numbered exhibits, such as "Ex. 1," refer to exhibits to the relevant motion *in limine* submitted by BGC.  Where the same document is attached as an exhibit to both parties' papers, its alphabetical and numerical exhibit numbers may be used interchangeably.  For motions in which both IBM and BGC labeled exhibits using letters, the appropriate sections of the Order specify which motion or declaration the lettered exhibits are attached to.

[3] Whether the parties' relationship is governed by the IPLA or by a bespoke agreement signed by the parties in 1992 (the "Euro Brokers Agreement") is an unresolved, genuine issue of material fact.  See SJ Decision at 7-13.

even if "no damage occurs until later."  Ely-Cruikshank Co. v. Bank of Montreal, 81 N.Y.2d

399, 402 (1993).  "'[E]xcept in cases of fraud where the statute expressly provides otherwise, the

statutory period of limitations begins to run from the time when liability for wrong has arisen

even though the injured party may be ignorant of the existence of the wrong or injury.'"  Id.

(quoting Schmidt v. Merchs. Despatch Transp. Co., 270 N.Y. 287, 300 (1936)).  However, where

"'a duty imposed prior to a limitations period is a continuing one, the statute of limitations is not

a defense to actions based on breaches of that duty occurring within the limitations period.'"

Westchester Cnty. Corr. Officers Benevolent Ass'n v. Cnty. of Westchester, 885 N.Y.S.2d 728,

732 (App. Div. 2009) (quoting DeCintio v. Cohalan, 795 N.Y.S.2d 459, 460 (2005)).

    IBM asserts that the 2008 KPMG audit report is the earliest admissible evidence of

BGC's over-deployment of Informix software, and that any evidence of over-deployment

occurring prior to 2008 is inadmissible.  Since the Court will allow the introduction of evidence

regarding BGC's use of software prior to 2008, this argument is unavailing.  See infra at §

VI(A).

    Next, IBM argues that if such evidence is admitted, there is a genuine issue of material

fact as to pre-2008 over-deployment and the trier of fact will be entitled to reject BGC's

evidence as unreliable.  This is true as far as it goes; if BGC may introduce evidence regarding

its pre-2008 usage of Informix software, IBM must be free to offer its own contravening

evidence.  But that is not sufficient to entitle IBM to introduce evidence of the harm it suffered

from any such pre-2008 over-deployment, as that harm would be beyond the IPLA's statute of

limitations.  Any such evidence would therefore be irrelevant to the damages that BGC may be

held liable for and could only serve to prejudice the trier of fact.

    Finally, IBM argues that BGC's failure to pay a September 2008 invoice and its ongoing

over-deployment of Informix software constituted a continuing violation of the IPLA, such that "each day that BGC's use of Informix exceeded the level authorized . . . , BGC breached anew its ongoing contractual obligations."  (Pl.'s Opp'n at 4-5.)  The IPLA states, however, that a licensee is required to "notify IBM . . . and pay any applicable charges" if it wishes to increase its level of use, and that "[t]he amount payable for a Program license is a *one-time charge*."  (Ex. B at § 2 (emphasis added).)  Assuming, *arguendo*, that the IPLA applied and was breached, the breach occurred at the time of BGC's initial failure to notify or pay IBM, but its ongoing failure to correct this breach does not constitute a continuing violation.  To hold otherwise would "overlook[] the distinction between a breach and the ability to cure a breach."  First Am. Title Ins. Co. of N.Y. v. Fiserve Fulfillment Servs., Inc., No. 06 Civ. 7132, 2008 WL 3833831, at *2 (S.D.N.Y. Aug. 14, 2008); see also Sanchez de Hernandez v. Bank of Nova Scotia, 908 N.Y.S.2d 45, 46-47 (App. Div. 2010); c.f. Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. 2007) (finding continuing violation where defendant repeatedly failed to make annual payments because "each successive breach may begin the statute of limitations running anew"); Faulkner v. Arista Records LLC, 602 F. Supp. 2d 470, 478 (S.D.N.Y. 2009) (ongoing failure to pay constituted continuing violation based on wording of contract, but "ordinarily would have become time-barred under New York law").  Since the IPLA contains a two-year statute of limitations, BGC may only be held liable for breaches of the IPLA occurring within the two years preceding the initiation of litigation, which would exclude any violations occurring prior to 2008.

For the reasons stated above, while IBM may introduce evidence of BGC's pre-2008 usage of Informix software, but evidence regarding contractual damages arising from such usage will be precluded.

4

## II.     BGC's Motion Regarding Profit Disgorgement

Infringement of a copyright entitles its owner "to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."  17 U.S.C. § 504(b).  IBM seeks recovery of all of BGC's profits, but first it must present proof of BGC's "gross revenue reasonably related to the infringement," excluding "unrelated revenues."  Davis v. Gap, Inc., 246 F.3d 152, 160 (2d Cir. 2001); see also Mackie v. Rieser, 296 F.3d 909, 915-16 (9th Cir. 2002) (copyright holder "must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated").  "Because of the at-best highly speculative nature of all indirect profits claims" such as those at issue here,[4] the decision to "send[] such claims to a jury should be extremely rare."[5]  6 William F. Patry, Patry on Copyright § 22:131 (2010).

BGC is an inter-dealer broker, which serves as an intermediary between financial institutions in transactions involving a variety of securities and financial instruments and whose revenue is derived from commissions charged on such transactions.  (Exs. A at § 2; C at 5, 79.)  BGC uses software, including Informix, for its in back-office functions, such as administratively processing trades after their execution and generating various reports and invoices.  (Ex. A at ¶¶

---

[4] "Direct profits" are "those that are generated by selling an infringing product," whereas "indirect profits" consist of "revenue that has a more attenuated nexus to the infringement."  Mackie, 296 F.3d at 914.

[5] IBM argues that BGC's motion is an improperly styled motion for summary judgment that fails to comply with the procedural rules governing such motions, but fails to direct the Court to any source of law supporting such an argument.  Summary judgment is "'designed to provide a mechanism by which unsupportable claims can be terminated before trial.'"  In re Methyl Tertiary Butyl Ether Prods. Liability Litig., 517 F. Supp. 2d 662, 664-65 (S.D.N.Y. 2007) (quoting Arthur R. Miller, The Pretrial Rush to Judgment, 78 N.Y.U. L. Rev. 982, 1019 (2003)) (emphasis in original).  Damages are a form of relief, however, rendering "summary judgment . . . an ill-suited procedural vehicle" because "the very concept of . . . summary judgment as to a particular remedy is outside the contemplation of the Federal Rules."  Id. at 666.  Rather, the admissibility of arguments and evidence regarding types of damages is properly addressed via motions in limine.  See, e.g. id. at 667; Faulkner v. Nat'l Geographic Soc., 576 F. Supp. 2d 609, 612-13 (S.D.N.Y. 2008).

7-8.)  BGC mentions that the "vast majority" of BGC's desks have "always used Sybase," a separate software system, rather than Informix.  (Id. at ¶ 11.)  BGC's customers are unaware of which software suite will be used to process their trades and are agnostic as to BGC's internal operations.  (Id. at ¶¶ 10-11, 13.)

While BGC has acknowledged that an "immediate disruption and cessation" of its use of Informix software would have a "devastating effect," it has consistently maintained that migration to another software system, such as Sybase, would have "little to no effect."  (Ex  D at 124.)  Affidavits previously submitted by BGC discussed the "integral" role played by Informix in BGC's business operations, but they made clear that the risk that BGC feared was premised on the short-term effect of forcing BGC "to revert to manually inputting massive volumes of trade data" because the "exceptionally complicated" process of migrating to a new software system could not be done overnight.  (Ex. H at ¶¶ 29, 33-36; see also Ex. I at ¶ 6.)  Given the time and resources to migrate to another software suite, however, the Informix software could be replaced without any harm to BGC's business.  Indeed, the partial migration that occurred prior to and while discovery was ongoing had "no effect" on BGC's business because alternative software was capable of "effectively provid[ing] the same functionality" as Informix.  (Ex. D at 125.)

Haas, IBM's damages expert, opined that IBM was entitled to disgorgement of BGC's profits in the amount of $100,926,000 (Ex. G at ¶ 40), based upon BGC's representations that the Informix software was "integrally important to the operations of BGC and its ability to service its customers."  (Id. at 38.)  Haas comes to this conclusion by taking BGC Financial, L.P.'s 2009 pre-tax income of $50,463,000, attributing all of it to BGC's infringement of the Informix

software, and then doubling it to account for BGC's then-unknown 2010 profits.[6]  (Id. at 39-40.)

This speculation is well short of the requisite factual demonstration that at least some portion of

BGC's profits "are attributable to [BGC's alleged] infringement."   17 U.S.C. § 504(b).

Furthermore, Haas's testimony regarding his methodology does not satisfy the requirement that

IBM present proof of BGC's "gross revenue *reasonably related* to the infringement" and exclude

"unrelated revenues."  Davis, 246 F.3d at 160 (emphasis added).  As in Davis, IBM has "failed to

discharge [its] burden by submitting [the defendants'] gross revenue," which includes revenue

that was not derived from the infringement itself.  Id. at 161.

Moreover, IBM has failed to proffer sufficient evidence of a "'causal link' between the

infringement and the revenues."   Granger v. Gil Abstract Corp., 566 F. Supp. 2d 323, 330

(S.D.N.Y. 2008) (quoting Davis, 246 F.3d at 160).  BGC did not market or sell the Informix

software to its customers and there is no evidence that its customers cared what software system

it used.  While BGC may have profited from using Informix indirectly in that it enabled BGC to

operate more efficiently, courts often "deny recovery if the profits 'are only remotely or

speculatively attributable to the infringement.'"  Lowry's Reports, Inc. v. Legg Mason, Inc., 271

F. Supp. 2d 737, 751 (D. Md. 2003) (quoting Konor Enters., Inc. v. Eagle Publ'ns, Inc., 878 F.2d

138, 141 (4th Cir. 1989)).  IBM points to nothing more than BGC's repeated statements that

Informix software is "integral" to its operations and that the sudden removal or failure of the

Informix software would have devastating consequences to BGC's operational efficiency.  But

simply saying that copyrighted material "may have played an 'important,' 'significant,' or

'meaningful' role" is insufficient, particularly where, as part of BGC's information technology

infrastructure, it compromises only a portion of what enabled BGC to conduct its business

---

[6] Haas's expert report was completed on November 8, 2010.

profitably.  Id. at 752.   Indeed, in a remarkably similar case in which a court addressed "[w]hether *all* of the defendant's profits are 'attributable to the infringement' merely because the plaintiff's software was an essential component of a larger profit-generating process,"[7] plaintiff's requested relief was found to be "too speculative" because the plaintiff failed to "do more than merely point to [defendant's] balance sheet" despite the fact that it was clear that the defendant's "entire gross revenue is not attributable to [plaintiff's] source code."  DaimlerChrysler Servs. v. Summit Nat'l, No. 02 Civ. 71871, 2006 WL 208787, at *2-3 (E.D. Mich. Jan. 26, 2003).

"In the absence of concrete evidence" regarding "the myriad factors that could influence [BGC's customers'] decisions" to engage BGC's services, Mackie, 296 F.3d at 916, IBM's indirect profits argument is overly speculative.  BGC's motion to bar the recovery of profits in the amount of $100,926,000 is therefore granted.

## III.  BGC's Motion to Preclude Duplicative Damages Evidence[8]

BGC seeks to preclude IBM from introducing argument or evidence of damages for copyright infringement because it asserts that IBM's copyright infringement and breach of contract claims seek duplicative damages as they stem from "precisely the same purported injury – BGC's allegedly unlicensed use of the same Informix software, at the same rates of deployment, before and after 2009."   (Defs. Mem. of Law at 6-7.)   Pursuant to IBM's allegations, BGC would not have breached the IPLA nor infringed IBM's copyrights if it had paid for the appropriate number of software licenses.  "A plaintiff is not entitled to recover twice

---

[7] The court explained that "although [defendant] could not likely have carried on business without [the software] (or some reasonable substitute), it does not follow that every cent of profit [defendant] generated was attributable to [the software]. . . . [Defendant] could not operate without its toilets either, but that does not mean that all of its profits are attributable to commodes."  DaimlerChrysler Servs., 2006 WL 208787, at *3.  This is quite similar to testimony offered by BGC's Chief Information Officer, who, when asked "why the IBM Informix Software was essential to BGC's business operations," explained that "[i]t's essential as a utility, just as the telephone would be essential as a utility in order for us to do business."  (Ex. F. at 224.)

[8] IBM initially argues that this issue is not properly addressed in a motion *in limine*.  For reasons already discussed, see supra n.6, this argument is unavailing.

for the same injury. . . . When violation of two distinct rights results from the same conduct, multiple recoveries are permissible – but only to the extent that two different types of harm have been suffered." Sparaco v. Lawler, Matursky, Skelly Eng'rs LLP, 313 F. Supp. 2d 247, 250-51 (S.D.N.Y. 2004); see also Francois v. Ruch, No. 03 Civ. 1419, 2006 U.S. Dist. LEXIS 90804, at *17-18 (C.D. Ill. Dec. 15, 2006).

In the instant matter, however, IBM's copyright infringement and breach of contract claims arise from only partially overlapping conduct by BGC. Specifically, the breach of contract claim is limited to BGC's conduct between January 7, 2008, as required by the IPLA's two-year statute of limitations, and December 31, 2008, when IBM terminated the IPLA. See supra § I. By contrast, the statute of limitations for copyright infringement is three years. Kregos v. Associated Press, 3 F.3d 656, 661 (2d Cir. 1993) (citing 17 U.S.C. § 507(b)). IBM's copyright claim therefore encompasses periods not included within its breach of contract claim, as it allows for damages relating to BGC's actions dating back to January 7, 2007, and occurring after the IPLA's termination. See Paramount Pictures Corp. v. Metro Program Network, Inc., 962 F.2d 775, 779 (8th Cir. 1992) (affirming award of copyright and contractual damages where "[t]he breach of contract claim . . . relates solely to events that occurred before May 6" and, "[i]n contrast, the copyright infringement claim relates to events that occurred after May 6."); J.S. Nicol, Inc. v. Peking Handicraft Inc., No. 03 Civ. 1548, 2008 WL 1809319, at *5 (S.D.N.Y. Apr. 21, 2008 ("Damages pursuant to the contract claim are not sufficient to remedy the additional damage suffered as a result of defendant's unauthorized use of plaintiff's designs after the expiration of the licensing agreement."). Accordingly, the central case upon which BGC relies is inapposite. See MCA Television Ltd. v. Public Interest Corp., 171 F.3d 1265, 1276 (11th Cir. 1999) ("we take no position on whether . . . a licensor would be entitled to treat a breach of a

licensing contract as a rescission, and to revoke a . . . license and sue in copyright for infringement if the licensee persisted" in its infringement).

BGC's motion to preclude argument and evidence relating to actual copyright damages is denied.

## IV.   BGC's Motion to Exclude Expert Report and Testimony of David A. Haas

Expert testimony is allowed where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).   "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." U.S. v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).   Though "district court[s] should not admit testimony that is 'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help,'" U.S. v. Mulder, 273 F.3d 91, 101 (2d Cir. 2001) (quoting U.S. v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991)), "[g]enerally 'the rejection of expert testimony is the exception rather than the rule.'"   Floyd v. City of New York, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (quoting Fed. R. Evid. 702 Adv. Comm. Notes (2000)).

Haas concluded that IBM's damages include $3,753,137 in actual copyright damages accruing between January 1, 2009 and December 31, 2010; and $1,239,116 in breach of contract damages accruing between January 7, 2008 and December 31, 2008.[9]   See supra at § I.   The breach of contract damages were calculated by assuming the accuracy of KPMG's conclusions regarding the volume of BGC's over-deployment of Informix Software and then applying an initial license fee and annual maintenance renewal fee for the volume of over-deployed software,

---

[9] This section addresses only those portions of Haas's report and testimony relating to actual copyright infringement damages and breach of contract damages accruing after January 7, 2008, as evidence regarding profit disgorgement and earlier contractual damages is not admissible.  See supra at §§ I, II.

with the fees based on IBM's historical Informix prices.  (See Levin Decl. Ex. E at ¶¶ 27-28.)
The copyright damages were determined by assuming that BGC continued to use the Informix
software at the levels calculated by KPMG after January 1, 2009; accounting for the initial
license fees and maintenance fees BGC would have paid for such software; and adding the
license and maintenance fees for additional Informix products that BGC has admitted to having
downloaded or used but which were not included in the KPMG audit.  (Id. at ¶¶ 31-35.)

      BGC concedes that "Mr. Haas has expertise" (Def.'s Mem. of Law at 1), but asserts that
his report and testimony should be excluded from trial because they were "not generated based
on any specialized knowledge, but rather involved basic calculations."  Schwartz v. Fortune
Mag., 193 F.R.D. 144, 147 (S.D.N.Y. 2000); see also Rx.com Inc. v. Hartford Fire Ins. Co., 426
F. Supp. 2d 546, 554 (S.D. Tex. 2006) ("an expert is not necessary at any stage to perform . . .
arithmetic calculations").  While it is true that the only quantitative analysis done by Haas
involved basic arithmetic, Haas asserts that his "expert opinion and analyses" were used "to
determine the appropriate inputs to these calculations."  (Pl.'s Opp'n, Ex. A at 19-20.)

      Haas did not mechanically perform rote calculations, but rather based his analysis on a
review of deposition transcripts and key documents, such as the IPLA and the KPMG audit
report, and multiple conversations with IBM employees regarding its regular course of conduct.
(See, e.g., id. at 38, 73, 109-10, 147.)  His qualitative determinations included eschewing a fee
discount that IBM sometimes offered to bulk purchasers, basing his calculations on BGC's over-
deployment of Informix software on 56 extra processors rather than the 446 unauthorized
concurrent sessions found by KPMG, employing historical prices for the software licenses rather
than their current prices (as had been done by IBM (see Ex. Levin Decl. Ex. H at IBM-
BGC_00005693)), and concluding that license fees for 2009 and maintenance fees for 2010

would provide appropriate compensation for BGC's alleged copyright infringement, among others.  (Pl.'s Opp'n Ex. A at 74-76, 95-99, 144-48, 184-85; Levin Decl. Ex. E at ¶ 28.)  Each of these decisions rely on Haas's "specialized knowledge [and] would assist the trier of fact in determining the potential damages in this case."  <u>Sparkman v. Thompson</u>, No. 08 Civ. 01, 2010 WL 5094253, at *1 (E.D. Ky. Dec. 14, 2010).  Accordingly, BGC's motion to exclude Haas's expert report and testimony (as limited, <u>see</u> <u>supra</u> n.9) is denied.

## V.    IBM's Motions to Preclude Under Fed. R. Evid. 402, 403 and 408

### A.    *Legal Standard*

Irrelevant evidence is *per se* inadmissible, while relevant evidence may yet be inadmissible pursuant to the Constitution, federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court.  Fed. R. Evid. 402.  Courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Evidence related to compromise offers and negotiations is inadmissible where it is offered "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction," but is admissible where offered "for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."  Fed. R. Evid. 408.

### B.    *References to September 11, 2001 World Trade Center Attack*

IBM seeks to preclude any references to the September 11, 2001 terrorist attack on the World Trade Center on the grounds that such references would be more prejudicial than probative.  BGC intends to argue that its use of Informix software is governed by the Euro

Brokers Agreement, which was destroyed along with all other business records it maintained in its World Trade Center-based New York office.  IBM contends that this explanation would engender sympathy for BGC from the jury.  Instead, IBM proposes a diluted stipulation that "[i]n 2001, Euro Brokers lost many of the paper records in its New York office through no fault of its own."  (Pl.'s Mem. of Law at 1.)

Where possible, a party should be allowed "to prove its case by evidence of its own choice."  Old Chief v. U.S., 519 U.S. 172, 186 (1997).  As the Supreme Court has explained,

> People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard.  A convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best.

Id. at 189.  References to September 11th have previously been excluded in this district due to "the danger of unfair prejudice given the emotions associated with the attacks," but the decision to do so occurred far closer in time to the terrorist attacks and where the references related only to a "collateral issue" that was "irrelevant."  Zubulake v. UBS Warburg, 382 F. Supp. 2d 536, 548 (S.D.N.Y. 2005).  More recently, testimony establishing that a defendant believed that all evidence against him was destroyed in the attack on the World Trade Center was found to have "probative value . . . [which] was not substantially outweighed by any prejudicial effect" because "[t]he mention of the World Trade Centers and September 11th was not inflammatory."  U.S. v. Salehi, 187 Fed. App'x 157, 164 (3d Cir. 2006).

As in Salehi, the probative value of explaining the loss of evidence is not outweighed by the prejudicial effect of reference to September 11th, 2001.  Moreover, to the extent that IBM is prejudiced whatsoever, jury instructions explaining that "'sympathy [can]not be the basis for the verdict'" can "ameliorate any such passion or prejudice."  Fryer v. A.S.A.P. Fire & Safety Corp.,

No. 09 Civ. 10178, 2010 WL 3191785, at *10 (D. Mass. Aug. 12, 2010) (quoting <u>Grossmith v. Noonan</u>, 607 F.3d 277, 280 (1st Cir. 2010)).  IBM's motion is therefore denied.

   C.   *Evidence of Informix's Custom Contracts with Non-Parties*
   IBM seeks to preclude evidence of Informix's contracts with companies who are not parties to the instant matter as irrelevant.  For the reasons discussed in § I.B of the <u>SJ Order</u>, the terms of the non-party contracts are relevant, as they have a "tendency to make . . . fact[s]" regarding the terms of the Euro Brokers Agreement "more or less probable than [they] would be without the evidence," and such facts are clearly "of consequence in determining the action." Fed. R. Evid. 401.  Accordingly, IBM's motion is denied.

   D.   *Evidence about Euro Brokers/BGC Entities in London*
   IBM seeks to preclude evidence regarding Euro Brokers or BGC entities based in London (the "London Entities") on the grounds that such evidence would be "irrelevant, confusing, and prejudicial."  (Pl.'s Mem. of Law at 5.)  IBM does not explain why a jury would be confused by the notion that a large corporation would have international subsidiaries and affiliates, or by reference to them.  IBM's conclusory declaration in this regard is unconvincing.  Next, IBM challenges the relevance of the London Entities despite its own reliance on KPMG's audit, which, it concedes, "encompassed London Euro Brokers/BGC employees who accessed Informix servers" (Pl.'s Reply at 3) and comprises a central part of IBM's case in chief, as it is heavily relied on by IBM's damages expert.  (<u>See</u> <u>supra</u> at § IV.)  IBM cannot have it both ways; if the London Entities are relevant for its own purposes, they are plainly relevant for BGC's as well.  Finally, IBM claims that allowing evidence regarding the London Entities would be prejudicial because BGC did not disclose said information during the discovery process, thereby limiting the evidence available to IBM.  This is not accurate; the record is replete with references

14

to the London Entities in both documents produced by BGC and the testimony of BGC deponents.  Moreover, the Court is unaware of any unfulfilled discovery requests related to the London Entities that were issued by IBM.  To the extent that IBM is prejudiced by its failure to collect evidence, it appears the fault is its own.  For the foregoing reasons, IBM's motion is denied.

E.      *IBM Settlement Offers or Offers to Compromise*

"In furtherance of the public policy of encouraging settlements and avoiding wasteful litigation, Rule 408 bars the admission of most evidence of offers of compromise and settlement." Trebor Sportswear Co., Inc. v. Ltd. Stores, Inc., 865 F.2d 506, 510 (2d Cir. 1989). IBM seeks to preclude the introduction of what it described at the time as a "settlement offer" in which it sought $1.4 million in connection with BGC's alleged failure to comply with the IPLA, constituting a 43% discount rate from its normal pricing schedule for the software package offered by IBM.[10]  (Ex. Y; see also Ex. E at  ¶¶ 28-32.)

Rule 408 extends to offers made before the initiation of litigation, see Trebor Sportswear, 865 F.2d at 510, but pre-litigation "business communications" remain admissible.  Olin Corp. v. Ins. Co. of N. Am., 603 F. Supp. 445, 450 (S.D.N.Y. 1985).  "It is often difficult to determine whether an offer is made 'in compromising or attempting to compromise a claim,'" though relevant factors exist, including (1) whether "a party is represented by counsel, (2) threatens litigation, (3) has initiated the first administrative steps in that litigation," (4) "the timing of the offer;" and (5) "the existence of a disputed claim."  Pierce v. F.R. Tripler & Co., 955 F.2d 820,

---

[10] Though IBM describes its motion more broadly, asserting that "BGC should be precluded from introducing evidence about IBM settlement offers or offers to compromise made in connection with IBM's audit of BGC" and from "relying on evidence of IBM's offers to compromise or settle the dispute that led to this litigation," the 43% discount offer is the only specific communication referenced in their papers.  (Pl.'s Mem. of Law at 5; Pl.'s Reply at 4.)  Accordingly, the Court will treat IBM's motion as regarding only this specific communication and will withhold judgment on other communications until specific objections are raised at trial.

827 (2d Cir. 1992).

The communication at issue was contained in an email from Luciano Guido ("Guido"), a software compliance executive at IBM, which was sent to business personnel at both BGC and IBM on December 17, 2008.  (Ex. Y.)  As of that date, it is not clear that litigation had yet been raised as a possibility; IBM points only to an earlier letter to BGC from R.C. Rolfe ("Rolfe") which contained the ambiguous threat that if the compliance issues were not resolved "amicably[,] . . . IBM will be forced to consider [its] available remedies."  (Ex. X.)  This could just as easily refer to terminating BGC's software licenses and cutting off its access to technical support, which IBM did on December 31, 2008, as it could to the initiation of litigation.  Nor does Rolfe's title, "vice president enterprise SW sales and compliance," provide any hint that the "available remedies" refer specifically to legal action rather than other forms of retaliation.

Following this exchange, negotiations continued "through business channels, as well as through both internal and outside counsel" until June 3, 2009, and litigation was not initiated until January, 2010, over one year after the communication at issue.  (Tierney Decl. at ¶ 14-15, Dkt. No. 26.)  Internally, it appears IBM considered compliance issues as a routine business operation governed by its internal "Software License Compliance Guidelines," which include a detailed 34-item step-by-step process for "Compliance opportunities" and a flowchart for "Escalation Guidance."  (Ex. 23.)  Moreover, Guido testified that when he used the term "settlement offer," he did not intend to suggest that it was an offer related to the settlement of legal claims.  (See Ex. 24 at 166-67, 284-85.)  Based on this record, the Court finds that the December 17, 2008, email was a "proposal made in the midst of a business communication" rather than a settlement-related offer subject to Rule 408.  L-3 Commc'ns Corp. v. OSI Sys., Inc., No. 02 Civ. 9144, 2006 WL 988143, at *6 (S.D.N.Y. Apr. 13, 2006) (citing, inter alia,

ongoing negotiations and that "no litigation had been filed or was imminent."). IBM's motion is denied.[11]

     *F.    Evidence Regarding IBM Audits of Non-Party Customers*

IBM seeks to preclude BGC from introducing evidence regarding IBM's audits, compliance measures and settlements with non-party customers as both irrelevant and inadmissible settlement negotiations. Evidence of IBM's conduct with non-party customers is relevant to its damages: if BGC can prove that IBM regularly gives discounts to customers, including those involved in compliance disputes, that would bolster BGC's argument that that a discount should be applied in determining the fair market value of the Informix software it used. See Davis, 246 F.3d at 172.

Whether such evidence is barred by Fed. R. Evid. 408, regardless of its relevance, is a closer issue, but the Court concludes that it is not. The negotiations and settlement offers IBM seeks to preclude do not relate to the same underlying conduct as that at issue here, namely BGC's alleged over-deployment of Informix software. Contra, e.g., Paster v. Pa. R.R., 43 F.2d 908 (2d Cir. 1930); Pace v. Paris Maint. Co., 107 F. Supp. 2d 251 (S.D.N.Y. 2000); see also 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 408.04 (2d ed. 2008) ("courts have deemed it against public policy to subject a person who has compromised a claim to the hazard of having a settlement proved in a subsequent lawsuit by another person asserting a cause of action arising out of the same transaction."). While "admission of such evidence may nonetheless implicate the same concerns of prejudice and deterrence of settlements which

---

[11] The Court notes that a grant of IBM's motion would not have precluded BGC from offering the expert opinion of Jim Geisman ("Geisman"), who independently concluded that the fair market value of BGC's licenses would have included a volume-based 40% to 60% discount from IBM's price schedule. (Ex. E at ¶ 35; see also infra at §V.A.) The actual discount offered by IBM "corroborated" the conclusion independently reached by Geisman. (Ex. E at ¶ 36.) Moreover, even if Geisman had relied on IBM's offer and the offer were inadmissible, Geisman's opinion would not be rendered inadmissible as a result. See Fed. R. Evid. 703.

underlie Rule 408," <u>Towerridge, Inc. v. T.A.O., Inc.</u>, 111 F.3d 758, 770 (10th Cir. 1997), "the balance is especially likely to tip in favor of admitting evidence when the settlement communications at issue arise out of a dispute distinct from the one for which the evidence is being offered."  <u>Zurich Am. Ins. Co. v. Watts Indus., Inc.</u>, 417 F.3d 682, 689 (7th Cir. 2005); <u>see, e.g.</u>, <u>Central Soya Co. Inc. v. Epstein Fisheries, Inc.</u>, 676 F.2d 939, 944 (7th Cir. 1982) (allowing evidence of third-party settlement "to demonstrate what the terms of the settlement . . . were" as necessary to understand the case at bar, but not "for the purpose of demonstrating [a party] was or was not liable" in third-party litigation).

Moreover, it is unclear upon the record currently before the Court that the evidence IBM seeks to preclude is indeed subject to Rule 408.   Neither party has described the disputed evidence in sufficient detail for the Court to accurately assess whether they constitute settlement offers or mere business communications.  As discussed <u>supra</u> in § V.E, IBM engages in audits and compliance settlements as part of its routine business operations, many of which may fall outside of Rule 408's ambit.   Accordingly, IBM's motion is denied, though the Court will entertain objections to specific evidence at trial.

   G.     *Evidence of Value to BGC of Changes to Informix Software*
   For the reasons discussed <u>infra</u> at § VIII.B, IBM's motion is granted.

   H.     *Cumulative Expert Testimony*
   BGC intends to introduce three expert witnesses at trial: Monty Myers ("Myers"), Geisman, and Dr. Blackburn.  IBM seeks to preclude the introduction of cumulative expert testimony based on Dr. Blackburn's expert report, which cites the reports of both Geisman and Myers.  Because Myers' testimony is precluded on other grounds, the Court denies IBM's motion with regard to Myers' testimony as moot.  (<u>See</u> <u>infra</u> at § VIII.B.)

With respect to Geisman and Dr. Blackburn, this is not a case in which "[m]ultiple expert witnesses express[] the same opinions on a subject," rendering their duplicative testimony "a waste of time and needlessly cumulative." Sunstar, Inc. v. Alberto-Culver Co., Inc., No. 01 Civ. 736, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004). Rather, Geisman opines on software pricing models, while Dr. Blackburn relies on Geisman's work in providing an economic analysis of the damages claimed by IBM. Dr. Blackburn's reliance on Geisman's work is permitted and "does not render [his] expert report unnecessarily 'cumulative.'" Banks v. U.S., 93 Fed. Cl. 41, 51 (Fed. Cl. 2010); see also U.S. v. 1,014.16 Acres of Land, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983). Accordingly, IBM's motion is denied with regard to the overlap between the testimony of Geisman and Dr. Blackburn.

## VI.   IBM's Motions to Preclude Under Fed. R. Civ. P. 26 and 37

### A.   *Legal Standard*

In relevant part, Rule 26(a)(1)(A)(ii) requires parties to initially disclose "all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses;" Rule 26(a)(2)(B) requires expert witnesses to submit a report that contains, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them;" and Rule 26(e)(1)(A) requires parties to supplement or correct their disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other part[y]."

"If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In determining whether

exclusion is justified, the Court may consider "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (quoting Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 961 (2d Cir. 1997)). "The purpose of the rule is to prevent the practice of sandbagging an opposing party with new evidence. Although a bad-faith violation of Rule 26 is not required in order to exclude evidence pursuant to Rule 37, it can be taken into account as part of the party's explanation for its failure to comply." Haas v. Del. & Hudson Ry. Co., 282 Fed. App'x 84, 86 (2d Cir. 2008) (internal quotations omitted).

   B.   *Evidence Contradicting KPMG's Audit*
   IBM seeks to preclude BGC from introducing any testimony or other evidence contradicting KPMG's report of BGC's deployment of IBM Informix computer programs, alleging that BGC's production of contravening evidence was untimely.

   First, IBM notes that in BGC's interrogatory responses of September 1, 2010, and September 27, 2010, BGC denied having records of the number of users or concurrent sessions of Informix software prior to December 31, 2008. (See Exs. B, K.) In its November 3, 2010 update, BGC repeated its assertion that it lacked such records, but added that the number of concurrent sessions "may have been ascertainable based on some of the data collected during KPMG's audit of BGC's use of Informix software in the summer of 2008." (Ex. L.) It is unclear how the inclusion of this additional sentence prejudices IBM.

   Second, IBM alleges that the November 3, 2010 update contains "new information" about BGC's use of Informix software. (Pl.'s Mem. of Law at 11.) This vague assertion fails to

explain with any specificity what information IBM is referring to, what its relevance might be, or why IBM is burdened by its delayed production.  Though this update was provided after the close of fact discovery on October 25, 2010, the Court notes that BGC updated information that had been provided approximately one month earlier; was provided only one week after the close of fact discovery; and was provided in response to correspondence on October 4 and 5, 2010, in which IBM provided greater specificity regarding what information it sought than was included in the interrogatory itself.  (See Ex. 28.)  This timeline hardly evidences bad faith or undue delay on the part of BGC.  Moreover, while IBM asserts that it should be entitled to reopen discovery in light of the November 3, 2010 update, it is unclear how it suffered any greater harm than if the update had been provided one week earlier, satisfying the scheduled close of fact discovery but still leaving IBM no time to "investigate and formulate a response."  (Pl's. Mem. of Law at 11.)

Next, IBM objects to the introduction of a table prepared by BGC in connection with the report of BGC's expert, Dr. David Blackburn ("Dr. Blackburn"), which "was not produced with any underlying documentation."  (Id.)  The table includes a column entitled "How it was gotten," however, which explains the source of the data contained therein.  (See Ex. M.)  Along with Dr. Blackburn's rebuttal report, the table was provided to IBM on November 22, 2010.  IBM does not assert that this violated the case management plan's deadline for expert discovery, and IBM was free to question Blackburn regarding this document at his deposition on December 8, 2010.  (See Ex. 37.)  IBM was not prejudiced by the creation or production of the table after the close of fact discovery.

Finally, IBM objects to BGC's purported production of "hundreds of pages of documents . . . that it apparently intends to use at trial, presumably to challenge the findings in the KPMG audit report."  (Pl's. Mem. of Law at 11.)  It has failed to identify any specific documents that fit

21

this description and has not provided any information regarding the date or context of such documents' production.  IBM has failed to provide sufficient information for the Court to evaluate the merits of its argument.

For the reasons stated above, IBM's motion to preclude the introduction of evidence contradicting the KPMG audit report is denied.

### C.    Evidence Supporting Laches, Estoppel and Unclean Hands Defenses

IBM seeks to preclude BGC from introducing evidence supporting its affirmative defenses of laches, estoppel and unclean hands, on the basis of BGC's filing of an errata sheet to a deposition after the close of fact discovery and BGC's failure to respond to an interrogatory requesting information regarding its affirmative defenses.

First, the errata sheet to the deposition of Yvette Tierney ("Tierney"), BGC's corporate representative, was provided to IBM in a timely manner.  Fed. R. Civ. P. 30(e) allows 30 days for deponents to review the transcript of their deposition and make substantive changes to their testimony by a signed writing that provides the reason for the changes made.  Though Tierney's deposition occurred on September 28, 2010, the final transcript of her testimony was not sent to the parties until October 12, 2010.  The errata sheet, which contained testimony by Tierney related to BGC's estoppel defense, was submitted on November 10, 2010.  It was provided within the time limit proscribed by Rule 30(e) and there is no basis for precluding evidence of BGC's estoppel defense.

Second, with regard to IBM's interrogatory, which requested that BGC "identify all facts, legal bases, documents . . . , and materials that tend to support or refute the allegations in the Answer and Counterclaims and identify the person(s) with the most knowledge regarding [BGC's] affirmative defense[s] or cause[s] of action," BGC initially responded by noting various

22

objections on May 17, 2010.  (Ex. N.)  Subject to its objections, BGC provided a list of the five most knowledgeable individuals.  (Id.)  BGC refused to provide further information, ultimately supplementing its response with the further objections that the interrogatory was "overly broad, unduly burdensome, and calls for the production of privileged information" and citing relevant caselaw.  (Ex. S.)

As a preliminary matter, the Court notes that the better practice would have been for IBM to move to compel a fuller, more complete response at an earlier stage of this proceeding instead of holding back on corrective action and then attempting to preclude BGC's affirmative defenses via a motion *in limine*.  See Hardy v. Twn. of Greenwich, No. 3:06 Civ. 833, 2008 WL 5117370, at *7 (D. Conn. 2008) ("Typically, a Rule 37(c) motion asks the court to preclude a new witness or a new exhibit, not a new legal theory.  Such situations comport with the language of Rule 37(c), which speaks in terms of 'evidence'").  Regardless, BGC's objections are well-taken; IBM's interrogatory was an improper request for each of the reasons specified by BGC.  See Eame Corp. v. Twn. of Auburn, 176 F.R.D. 433, 437 (D. Mass. 1997); Hilt v. SFC Inc., 170 F.R.D. 182, 187-88 (D. Kan. 1997).

The Rules of Civil Procedure "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  If the Rules' drafters "intended to authorize interrogatories with an impact as wide as the entire case, they could more realistically and easily have adopted a simple rule to require every pleading to be accompanied by a statement of all the facts supporting and every allegation and the identification of every knowledgeable person and supporting document."  Hilt, 170 F.R.D. at 187.  They did not do so.  Accordingly, interrogatories that "indiscriminately sweep an entire pleading" and "require the responding party to provide in essence a running narrative or

description of the entire case, together with identifications of all knowledgeable persons and supporting documents" are inherently improper.  Id. at 188.  BGC's refusal to answer this interrogatory provides no basis for IBM's request relief of the exclusion of all evidence in support of its affirmative defenses.  IBM's motion to preclude evidence supporting BGC's affirmative defenses is denied.

    D.    *Evidence Relating to Apportionment of Profits*
    When seeking disgorgement of profits pursuant to 17 U.S.C. § 504(b), the copyright owner bears the burden of presenting proof of the infringer's "gross revenue reasonably related to the infringement, not [including] unrelated revenue."  Davis, 246 F.3d at 160.  Because the Court grants BGC's motion to preclude IBM's indirect profit disgorgement argument as overly speculative (see supra at § II), IBM's motion to preclude rebuttal evidence is denied as moot.

    E.    *Evidence Regarding Damages for BGC's Breach of Contract Counterclaim*
    IBM seeks to preclude BGC from introducing evidence related to damages it suffered as a result of IBM's breach of contract.  In its June 1, 2010 initial disclosures pursuant to Fed. R. Civ. P. 26, BGC disclosed two categories of damages: (1) "As yet un-quantified costs incurred by BGC in maintaining and supporting the Informix software without the assistance of IBM," and (2) "As yet un-quantified costs incurred by BGC in connection with and as a result of its forced migration off of the Informix software."  (Ex. T.)

    With respect to the former category, BGC has failed to direct the Court to any testimonial or documentary evidence suggesting that it incurred such costs.  IBM, on the other hand, notes that two BGC employees testified that they were unaware of any adverse impact on BGC stemming from its post-2008 lack of technical support from IBM.  (Ex. Z at 185; Ex. C at 219.) Because it appears that the discovery process has failed to reveal any evidence of costs incurred

as a result of IBM's failure to provide technical support, IBM's motion is partially granted. Pursuant to Rule 37(c)(1), BGC may not introduce any such evidence at trial.

With respect to costs incurred in BGC's migration to Sybase in place of Informix software, however, BGC has produced sufficient evidence to satisfy Rules 26 and 37. Specifically, BGC produced spreadsheets showing the costs it has incurred in its software migration efforts on September 17, 2010, updated versions of which were produced on January 6, 2011.  (See Wellner Decl. Opposing IBM's Mot. for Summary Judgment Exs. 98, 99.)  BGC did not disclose any expert testimony on this topic because it will not introduce any, "as none is needed to help the jury . . . understand BGC's damages."  (Defs.' Mem. of Law at 22.)  While IBM notes that BGC failed to update its initial disclosures to reflect this information, Rule 26(e)(1)(A) only requires timely updates to incomplete disclosures "if the additional or corrective information has not otherwise been made known to the other part[y]."  This duty to update is inapplicable where, as here, the corrective information has been produced and where IBM does not assert that it was unaware of its production.  None of the cases cited by IBM are to the contrary and all apply to situations dissimilar to that at bar.  See In re Illusions Holdings Inc., 189 F.R.D. 316 (S.D.N.Y. 1999) (addressing undisclosed expert testimony); Malibu Consulting Corp. v. Funair Corp., No. 06 Civ. 735, 2007 WL 2317263 (W.D. Tex. Aug. 9, 2007) (same); Wilson v. Bradlees of New Eng., Inc., 250 F.3d 10 (1st Cir. 2001) (same); Atmel Corp. v. Info. Storage Devices, Inc., 189 F.R.D. 410 (N.D. Cal. 1999) (same); Design Strategy, Inc. v. Davis, 469 F.3d 284 (2d Cir. 2006) (party failed to disclose a category of damages in initial disclosures, provide damages calculation upon request, or provide documents necessary for damages calculation).  Accordingly, IBM's motion is partially denied.  BGC may introduce evidence of costs it incurred in its migration from the Informix software.

## VII.   IBM's Motion to Preclude Testimony Protected by Privilege

BGC disclaims any intention of offering evidence that would encroach upon the attorney-client privilege, and IBM fails to identify any specific evidence or line of questioning that it fears would do so.  The Court expects all parties to conduct themselves in a responsible and ethical manner at trial.  IBM's motion is therefore denied as moot.

## VIII.   IBM's Motion to Preclude Testimony by BGC's Experts

### A.   *Jim Geisman*

#### 1.   <u>Qualifications</u>

A witness must be qualified to offer expert testimony "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "Courts within the Second Circuit have liberally construed expert qualification requirements" and have allowed "an expert to testify as to matters within his general expertise even though he lacked qualifications as to certain technical matters within that field."  <u>Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC</u>, 691 F. Supp. 2d 448, 457 (S.D.N.Y. 2010) (internal quotations omitted and citing <u>McCullock v. H.B. Fuller Co.</u>, 61 F.3d 1038 (2d Cir. 1995); <u>see also</u> <u>Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.</u>, No. 04 Civ. 7369, 2006 U.S. Dist. LEXIS 51869, at *15, *19 (S.D.N.Y. July 28, 2006) (rejecting "an overly narrow test of . . . qualifications" and allowing testimony of damages expert without industry-specific training or experience).  As noted <u>supra</u>, "[g]enerally 'the rejection of expert testimony is the exception rather than the rule.'"  <u>Floyd</u>, 861 F. Supp. 2d at 287 (quoting Fed. R. Evid. 702 Adv. Comm. Notes (2000)).

IBM argues that Geisman, one of BGC's expert witnesses, lacks experience pricing the specific type of software at issue.  Geisman is a principal with a management consultancy that he founded in 1982 and which has worked exclusively on developing software pricing models since

1987.  (Wellner Decl. Ex. A at ¶ 6.)  He is a frequent speaker at academic and trade conferences and a member of the Board of the Professional Pricing Society.  (Id. at ¶¶ 10-13, 16.)  In his capacity as a consultant, Geisman has assisted approximately two hundred companies in pricing myriad types of software, which are used across a wide range of industries.  (See generally Wellner Decl. Ex. C.[12])  Given the breadth of Geisman's software pricing experience, the Court finds that he is qualified to opine on the Informix software's pricing as it relates to calculations of IBM's damages.

IBM further objects that Geisman lacks experience in pricing software in the specific context of copyright infringement and compliance disputes.  Should IBM prevail on its claims, however, it would be entitled to the "fair market value of a license covering the defendant[s'] infringing use."  Davis, 246 F.3d at 172.  That Geisman is now being asked to provide his opinion related to an ongoing dispute is irrelevant, as that context plays no role in the software's fair market value.  IBM fails to cite any legal authority suggesting otherwise, instead relying on the testimony of Haas, its own expert, regarding determinations with which Geisman disagrees.  Whether Geisman or Haas is correct is a matter for the trier of fact to decide and their disagreement bears no relationship to Geisman's qualifications (or Haas's).

## 2.    Reliability

District courts "have considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable," with the objective of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in

---

[12] In opposition to IBM's motion, Geisman submitted a declaration that elaborates on his experience and specifically identifies a number of the clients and software for which he has developed pricing models.  IBM does not assert that the declaration contradicts Geisman's expert report or his deposition testimony in any way.  To the extent that it is untimely, "the Court is satisfied that the delay is . . . harmless" and will therefore consider its contents.  Emig v. Electrolux Home Prods., Inc., No. 06 Civ. 4791, 2008 U.S. Dist. LEXIS 68811, at *9-12 (S.D.N.Y. Sept. 11, 2008).

the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). While a scientific or engineering expert's use or failure to use a particular methodology may provide reason to exclude their testimony, see, e.g., Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005); Dora Homes, Inc. v. Epperson, 344 F. Supp. 2d 875, 887-88 (E.D.N.Y. 2004), experts may also rely "primarily, if not solely, on their experience" or "'years of accumulated learning and insight.'" Emig, 2008 U.S. Dist. LEXIS 68811, at *28 (quoting Liriano v. Hobart Corp., 949 F. Supp. 171, 177 (S.D.N.Y. 1996)).

As set out in his report, Geisman's conclusions are based not only on his experience, but also on (1) his "review and knowledge of [software] industry practices;" (2) a review of the report submitted by Haas; and (3) documents produced in this litigation, particularly those regarding IBM's price discount policies. (Wellner Decl. Ex. A at ¶¶ 26-39.) This provides a sufficient basis to satisfy the reliability requirements of Fed. R. Evid. 702. To the extent that IBM takes issue with Geisman's conclusions or the determinations on which they rest, they may be "properly explored on cross-examination and [go] to his testimony's weight and credibility – not its admissibility." McCullock, 61 F.3d at 1043. Accordingly, the Court denies IBM's motion to exclude Geisman's report or testimony.

### B.    *Monty Myers*

Myers, founder and chief executive officer of a software development company, has submitted an expert report in which he opines on "the relative benefit and value to BGC of the changes and feature enhancements made by IBM to the [Informix Dynamic Server ("IDS")] product between versions IDS 9.21.UC1 and IDS 9.40.FC4/IDS 9.40.TC8." (Wellner Decl. Ex. G at 6.) Based on Myers' conclusions, BGC plans to assert that "these changes are *de minimis*

28

and that BGC should not be required to pay the full list price for any licenses for the [IDS] acquired after the alleged transition to [the IPLA]."  (Wellner Decl. Ex. I at ¶ 25.)

The actual damages sought by IBM consist of the "fair market value of a license covering the [BGC's] infringing use," <u>Davis</u>, 246 F.3d at 172, where the infringing use was the unauthorized reproduction of IBM's software.  (First Am. Compl. at ¶ 32 (citing 17 U.S.C. § 106 (granting copyright owner exclusive right to reproduce or authorize reproduction of copyrighted work)).)  Regardless of whether BGC has any continuing rights to the use of earlier versions of IDS pursuant to the Euro Brokers Agreement (<u>see</u> <u>SJ Decision</u> at § II), the relative merits of any versions of IDS that BGC was authorized to use as compared to those versions of IDS for which BGC lacked authorization bears no relationship to the latter's fair market value.  Needless to say, if the trier of fact determines either that BGC retained no rights to any version of IDS under the Euro Brokers Agreement or that BGC did not infringe IBM's copyright, Myer's testimony would be equally irrelevant.  Accordingly, Myer's testimony and report are inadmissible because they cannot "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  IBM's motion to preclude them is granted.

### C.   Dr. David Blackburn

IBM seeks to partially preclude the testimony by Dr. Blackburn, BGC's damages expert, often without citing any legal authority in support of its requested relief.  First, IBM asserts that Dr. Blackburn should not be allowed to "render an opinion regarding the substance of the expert reports of Messrs. Geisman or Myers," but fails to explain what it means by the term "render an opinion" or how doing so would be distinct from relying on their expert opinions.  Though IBM seems to draw a distinction between "rendering an opinion" on their work and "relying" on it (<u>see, e.g.</u>, Pl.'s Reply at 7 n.12), the Court cannot discern any difference based on IBM's motion

papers or anything cited therein.  It is well settled that Dr. Blackburn is entitled to "rely on the opinion of experts in other fields as background material for arriving at [his own] opinion," 1,014.16 Acres of Land, 558 F. Supp. at 1242, regardless of their admissibility.  See Fed. R. Evid. 703.

Second, IBM seeks to preclude Dr. Blackburn from testifying regarding contractual damages because he excludes the initial license fees for software allegedly over-deployed in 2008 in his findings regarding what damages would be under the IPLA's two-year statute of limitations, discussed supra in § I.  In determining the admissibility of expert testimony under Fed. R. Evid. 702, district courts may consider the purported expert's expertise and the reliability and relevance of their testimony, but should do so "without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."  Amorgianos v. Amtrak, 303 F.3d 256, 266 (2d Cir. 2002).  IBM questioned Dr. Blackburn extensively regarding these conclusions and their underlying methodology at his deposition (see, e.g., Wellner Decl. Ex. J at 214-32), and IBM may further challenge the conclusions drawn by Dr. Blackburn at trial.

Third, IBM seeks to preclude Dr. Blackburn from testifying regarding actual damages for copyright infringement because he does not include license fees for BGC's alleged post-2008 copyright infringement.  In his report, Dr. Blackburn explains that he excludes such damages because they "would already be covered by the [breach of contract] damage payments" sought by IBM and, therefore, "should not be charged for separately."  (Wellner Decl. Ex. I at ¶ 18; see also supra at § III.)  Again, this constitutes a challenge by IBM to Dr. Blackburn's conclusion, rather than his methodology or expertise.

Fourth, IBM seeks to preclude Dr. Blackburn from testifying that IBM is not entitled to any actual damages for copyright infringement occurring in 2010, in contrast to Haas's conclusion that IBM's actual damages in 2010 amounted to $625,179 in annual maintenance fees that BGC failed to pay.  (See Wellner Decl. Ex. I at ¶ 22, Attachment 3A.)  Dr. Blackburn concluded that BGC was not liable for these maintenance fees because, *inter alia*, IBM did not provide any maintenance or support services to BGC after mid-2009; IBM ceased offering maintenance services for the versions of IDS actually employed by BGC prior to 2010; and BGC was reducing its use of Informix software as it migrated to Sybase in 2010, which Haas's methodology failed to account for.  (Id. at ¶¶ 22-24.)  Dr. Blackburn has provided adequate explanation for his conclusion and is entitled to disagree with Haas's.

Fifth, IBM seeks to preclude Dr. Blackburn from rebutting Haas's testimony regarding profit disgorgement.  The Court has already granted BGC's motion to preclude IBM's indirect profit disgorgement argument as overly speculative (see supra at § II), rending this argument moot.  Accordingly, IBM's motions regarding Dr. Blackburn's testimony are denied.

## CONCLUSION

For the foregoing reasons, the motions by BGC and IBM are granted and denied as indicated.  Specifically, IBM is precluded from introducing evidence of (1) contractual damages pre-dating January 7, 2008; and (2) disgorgement of BGC's profits.  IBM is not precluded from introducing (3) evidence of actual copyright damages or (4) Haas's expert report and testimony. BGC is precluded from introducing (5) evidence of the value to BGC of changes made to the Informix software; (6) evidence of costs it incurred due to IBM's failure to provide maintenance and technical support; and (7) Myers' expert report and testimony.  BGC is not precluded from introducing evidence regarding (8) to the destruction of documents related to the lawsuit that

were kept at the World Trade Center; (9) Informix's customer contracts with non-parties; (9) the

London entities; (10) IBM's December 17, 2008, settlement offer; (11) IBM's non-party audits

and settlements; (12) faults in the KPMG audit; (13) BGC's affirmative defenses; (14) costs

BGC incurred due to its migration from the Informix software; and (15) the expert reports and

testimony of Geisman and Dr. Blackburn.

Dated: New York, New York
     April 25, 2013

SO ORDERED

PAUL A. CROTTY
United States District Judge

32